UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DAVID R. LAWSON, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:07-cv-196-RLY-MJD |
| | ) | |
| SUN MICROSYSTEMS, INC., | ) | |
|     Defendant. | ) | |

**ENTRY ON DEFENDANT'S RENEWED RULE 50 MOTION**

Defendant, Sun Microsystems, Inc. ("Sun"), renews its motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is **GRANTED** in part, and **DENIED** in part.

**I.     Background**

In 2005, Plaintiff worked on a commission basis as a Service Sales Executive ("SSE") for Storage Technology Corporation ("STK"). His compensation was governed by three documents, which were revised annually: (1) a Service Sales Executive Incentive Plan ("the "STK Plan"), (2) an Incentive Plan Administration Document ("IPAD"), and (3) a Quota Document (collectively, the "2005 STK Plan Documents"). The STK Plan provided that a sales representative like Plaintiff was entitled to incentive compensation if: (1) the sales representative executed, *inter alia*, a binding Executive Sales Services ("ESS") contract or an assigned renewal and (2) the customer was initially invoiced in the same fiscal year. (Trial Ex. 1 at 1-3). The STK Plan "remained in effect until a

subsequent plan, or amendment to the Plan, became effective." (*Id*. at 6).

In the Summer of 2005, while Plaintiff was pursuing a maintenance and support contract with JP Morgan Chase & Co. ("JPMC"), STK was acquired by Sun. Plaintiff continued to pursue the deal with other Sun employees. Plaintiff contends that, after securing the JPMC deal in the Spring of 2006, Sun denied him the substantial commission he believed he was entitled to under the 2005 STK Plan, by designating the JPMC deal as an "assigned renewal" under the 2006 Sun Plan rather than an ESS contract under the 2005 STK Plan. ESS contracts are defined as either: (1) third party software (software not made by STK, but sold by STK); or (2) equipment not manufactured or sold by STK, and not previously covered by STK maintenance. (*Id*. at 3). ESS contracts generated a much higher commission to an SSE than an assigned renewal contract. (Plaintiff Test. at 199). In the present case, the difference between a commission based on an ESS contract and a commission based on an assigned renewal amounted to well over $1,000,000.

In January 2007, Plaintiff filed the present lawsuit under the court's diversity jurisdiction for: (1) breach of contract, (2) unpaid wages under Indiana's Wage Claims Statute, and (3) quantum meruit. On March 18, 2011, Sun moved for summary judgment on all of Plaintiff's claims, and on its counterclaim under the California and Illinois eavesdropping statutes. In pertinent part, the court found that: (1) the STK Plan Documents constituted an enforceable contract; (2) there was a material issue of fact as to whether the STK Plan Documents, or the 2006 Sun Plan, governed Plaintiff's incentive pay for the JPMC deal and unpaid wages; (3) Plaintiff's incentive pay was a "wage"

under Indiana's Wage Claims Statute; and (4) Indiana's choice of law rules required the application of Indiana law to Sun's counterclaim, and, under the facts presented, Plaintiff was not liable under the Indiana Wiretap Act. The court also found that Plaintiff could not pursue a claim for quantum meruit, as that remedy may only be pursued in the absence of an enforceable contract. (*See* Docket # 230).

The court held a jury trial in this matter from August 27 to August 29, 2012, on Plaintiff's breach of contract and wage claims. Although Sun never formally moved to dismiss its counterclaim, it did not pursue the claim at trial. Sun moved for judgment as a matter of law on both claims. The court took the matter under advisement, and, without objection, submitted only the breach of contract claim to the jury. At the conclusion of the trial, the jury found that Sun breached the 2005 STK Plan by failing to pay Plaintiff incentive compensation with respect to the JPMC deal in accordance with the 2005 STK Plan, and awarded Plaintiff $1,500,000 in damages. Sun renews its motion for judgment as a matter of law on Plaintiff's breach of contract and wage claims. For the reasons set forth below, the motion is **GRANTED** in part, and **DENIED** in part.

## II.     Standard of Review

Pursuant to Rule 50 of the Federal Rules of Civil Procedure, a district court may enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a) (motion for judgment as a matter of law), (b) (renewed motion for judgment as a matter of law). "'The standard governing a Rule 50

3

motion mirrors that employed in a motion for summary judgment.'" *Winters v. Fru-Con, Inc.*, 498 F.3d 734, 745-46 (7th Cir. 2007) (quoting *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 578 (7th Cir. 2003)). Thus, the court "construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence." *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012) (citing *Tart v. Illinois Power Co.*, 366 F.3d 461, 464 (7th Cir. 2004)). In conducting this review, the court does not make credibility determinations or weigh the evidence, and "'must disregard all evidence favorable to the moving party that the jury [was] not required to believe.'" *Id*. (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

## III. Discussion

Sun contends that the court should overturn the jury verdict with respect to Plaintiff's breach of contract claim for five reasons: (1) the STK Plan Documents did not comprise an enforceable contract for incentive compensation; (2) Plaintiff failed to fulfill all of the requirements to qualify for incentive compensation under the 2005 STK Plan; (3) Sun did not breach the 2005 STK Plan; (4) Plaintiff presented no evidence from which a reasonable jury could find that Sun and Plaintiff reasonably anticipated the damages alleged by Plaintiff when the 2005 STK Plan became effective or when it was published; and (5) the jury's $1,500,000 verdict is not rationally related to the evidence. Sun also contends that Plaintiff's incentive compensation was not a "wage" within the meaning of

Indiana's Wage Claim Statute. The court now turns to Sun's arguments with respect to Plaintiff's breach of contract claim.

### A.     Breach of Contract

#### 1.     The STK Plan Documents

Sun first argues that the STK Plan Documents were illusory because they did not obligate Sun to honor the STK Plan for purposes of determining Plaintiff's incentive pay. According to Sun, Plan Administrator Phil Auble ("Auble") had the authority to interpret the Plan and to unilaterally reduce Plaintiff's commission to zero. This same argument was raised and rejected by the court in its Entry on Defendant's Motion for Summary Judgment and in its Entry on Defendant's Motion to Reconsider. (*See* Docket # 230 at 19-23; Docket # 246). The court has read and reviewed its Entry on Defendant's Motion for Summary Judgment, the Seventh Circuit's decision in *Carroll v. Stryker*, 658 F.3d 675 (7th Cir. 2011), and the parties' respective briefs supporting and opposing the present motion, and is not persuaded that it misapplied the law under the facts of this case.

#### 2.     Incentive Pay Under the 2005 STK Plan

Next, Sun argues that Plaintiff presented no evidence from which a reasonable jury could find that Plaintiff fulfilled all of the requirements to qualify for incentive compensation under the 2005 STK Plan. Sun's argument ignores two key pieces of evidence, one of which has already been alluded to. First, the 2005 STK Plan explicitly stated that it remained in place until a subsequent plan became effective. (Trial Ex. 1 at 6). Second, the 2006 Sun Plan Goal Sheet, which Plaintiff received on April 4, 2006, and

was part of the overall Sun Plan, stated within its signature block that the 2006 Sun Plan was "not effective until this form has been completed and approved at all levels (including Finance)." (Trial Ex. 80 at 2). Plaintiff did not sign the Goal Sheet, and there was no evidence that the Goal Sheet was approved at all levels within Sun's management. Moreover, the JPMC deal was initially invoiced on March 23, 2006, over a week before Sun provided Plaintiff with the Goal Sheet. Thus, a reasonable jury could have found that the 2005 STK Plan was still in effect as of the date the JPMC deal was initially invoiced.

Sun mounts a number of arguments in support of its theory that the jury, in essence, erred. First, Sun contends that Plaintiff was "informed and knew" that he was being placed on the 2006 Sun Plan effective December 26, 2005. At trial, Plaintiff testified that he received a letter from Sun dated December 26, 2005 (the "Sun Letter" or "Letter"), informing him that: (1) he will transition to the 2006 Sun Plan; (2) his salary will remain at $75,000 and his incentive compensation will remain at $80,000; (3) he will be provided with a goal sheet that sets forth his specific targets and compensation elements, and:

> the terms and conditions of this Confirmation Letter, in conjunction with the Sun Welcome Letter, supersede any prior written or oral communications to you concerning the terms of your employment with StorageTek, such as future promotions, salary increases, bonuses, stock grants, etc., which are not documented within StorageTek's HR records. Your employment is subject to the terms and conditions contained herein and all other relevant Sun policies and procedures.

( Plaintiff's Trial Testimony at 287-290; Trial Ex. 37).

Plaintiff signed the Sun Letter on January 5, 2006; however, the signature block

6

specifically stated that Plaintiff's "signature acknowledges receipt and understanding of the terms of th[e] letter." (Trial Ex. 37). It does not indicate that Plaintiff agreed to what the Letter stated regarding a transition to the 2006 Sun Plan. This makes sense, because at the time that Plaintiff signed the Letter, there was no Sun Plan or Goal Sheet in effect. Furthermore, the terms of the Letter, reflected in the block quote above, do not specifically state that the Letter supersedes the 2005 STK Plan. To this end, a reasonable jury could have found that the STK Plan Documents would be the type of documents within STK's human resources records, and that therefore, they were not the type of communications that were superseded by the Sun Letter. In sum, a reasonable jury could have found that Plaintiff was not subject to the 2006 Sun Plan, by virtue of the Letter, as of December 26, 2005.

Second, Sun argues that the evidence unequivocally showed that the 2006 Sun Plan, released on March 13, 2006 (Plaintiff received it via email on March 17, 2006), was retroactive to December 26, 2005. For example, the 2006 Sun Plan stated that it was effective as of December 26, 2005; the 2004 and 2005 STK Plans contained similar language; and the testimony of former Sun saleswoman Tina Caldera ("Caldera"), former Sun financial analyst Mark Schlager ("Schlager"), and Auble, informed the jury that these types of incentive plans are always released after their effective date and are made retroactive to the effective date. (Trial Testimony of Tina Caldera ("Caldera Test.") at 257; Trial Testimony of Phil Auble ("Auble Test.") at 442, 445, 498; Trial Testimony of Mark Schlager ("Schlager Test.") at 512-13, 517, 542). The jury could have disregarded

this testimony in light of the fact that the 2006 Sun Goal Sheet contradicted the 2006 Sun Plan by stating that the Plan was "not effective" until it was approved at all levels, including Finance. Significantly, the 2004 and 2005 STK Plans contained no such language.

Third, Sun points to Schlager's testimony that the $17,000 draw Plaintiff received in February 2006 was a draw in anticipation of commissions to be paid in 2006 and recoverable under the 2006 Plan. (Schlager Test. at 516-20). Plaintiff submitted evidence at trial which contradicts Schlager's testimony. The first piece of evidence consisted of a "Draw Payment Schedule," which identified Plaintiff's Plan Title as "Service Sales Executive." Plaintiff's title under the 2005 STK Plan was "Service Sales Executive," whereas Plaintiff's job title under the 2006 Sun Plan was "Sales Specialist I." (Trial Testimony of David Lawson ("Plaintiff Test.") at 319; Trial Exs. 1, 3, 37). In addition, the Draw Payment Schedule directed Plaintiff to "the IPAD" for further information. (Trial Ex. 105). The "IPAD" referred to the Incentive Plan Administration Document, a 2005 STK Plan document. (Plaintiff's Trial Testimony at 319). There was no evidence of a 2006 Sun Plan IPAD.

Finally, Sun points to Auble's testimony indicating that Plaintiff did not submit a commission request within thirty days of the end of the 2005 fiscal year, as required by the 2005 STK Plan Documents. (Auble Test. at 437-38). Sun's argument ignores the fact that the jury could have reasonably believed that the 2006 Sun Plan was not in effect until April 4, 2006 – the date Plaintiff received his Goal Sheet. The evidence showed that

Plaintiff submitted his commission request on February 22, 2006, while the 2005 STK Plan was still in effect. Thus, a reasonable jury could have found that Plaintiff submitted a timely commission request under the 2005 STK Plan.

There is evidence in the record supporting the jury's determination that the 2005 STK Plan controlled Plaintiff's incentive compensation on the JPMC deal. Accordingly, the jury verdict finding that the STK Plan governed Plaintiff's incentive pay stands.

### 3. Sun's Breach

Sun asserts that Auble, who as Plan Administrator had the sole discretion and authority to interpret and administer the 2005 STK Plan, testified that Plaintiff did not meet the conditions necessary to qualify for incentive compensation on the JPMC deal under the 2005 STK Plan. Auble also testified that the only way Plaintiff could have been paid under the 2005 STK Plan would have been through the exception process, which falls outside the terms of the Plan. (*Id*. at 372-391). Sun contends that, in light of his testimony, no reasonable jury could have found that Sun breached the 2005 STK Plan.

The jury is entitled to weigh the credibility of a witness, and to believe or disbelieve his or her testimony. *Kapelanski v. Johnson*, 390 F.3d 525, 532 (7th Cir. 2004); *see also* Final Instruction No. 10. Thus, the jury was not *required* to credit Auble's testimony. To cite one example, Auble admitted on cross-examination that his opinion that the 2005 STK IPAD's definition of "ESS" had changed after Sun acquired STK to exclude Sun Microsystems as a manufacturer and to exclude service contracts

previously under maintenance with Sun, was in error. (*Id*. at 493) (testifying that the plain language of the IPAD directly conflicted with his opinion of "ESS"). Accordingly, the jury's determination that Sun breached the 2005 STK Plan is a reasonable conclusion based upon the evidence presented at trial.

### 4. Damages

Sun asserts that no reasonable jury could have concluded that the damages awarded to Plaintiff were reasonably anticipated by the parties when the 2005 STK Plan became effective or when it was published.

Under Indiana law, "the measure of damages for breach of contract is either such damages as may fairly and reasonably be considered as arising naturally, i.e., according to the usual course of things from the breach of contract itself, or as may be reasonably supposed to have been within the contemplation of the parties at the time they entered into the contract as a probable result of the breach." *Rogier v. American Testing and Eng'g Corp*., 734 N.E.2d 606, 614 (Ind. Ct. App. 2000). The test for measuring damages is an objective one, limited to what was reasonably foreseeable at the time the parties entered into the contract. *Id*. Damages which do not arise naturally from the breach of contract, or are not within the reasonable contemplation of the parties at the time the contract is entered into, are not recoverable. *Id*.

Plaintiff presented evidence that his damages were foreseeable. First, Plaintiff testified that he had been working on the deal prior to the issuance of the 2005 STK Plan. (Plaintiff Test. at 96-97) (testifying that he received a lead in July 2004). Second, Auble

testified that the 2005 STK Plan set no cap on what a SSE could earn. (Auble Test. at 344). Third, the 2005 STK Plan provided that an SSE could earn more than the target incentive through overachievement. (Trial Ex. 1 at 1). Fourth, the 2005 STK Plan also provided a formula to calculate the commission earned on a sales opportunity. (*Id*. at 3). Fifth, Plaintiff's supervisor, Paul Heidcamp, emailed Auble on December 8, 2005, regarding Plaintiff's incentive compensation on the JPMC deal. (Plaintiff Test. at 184-85; Trial Ex. 26). Auble did not respond. (Auble Test. at 347). And despite Plaintiff's repeated emails asking "legacy" STK and Sun executives to inform him how he would be paid on the JPMC deal, and despite his emails notifying the executives of what he thought he was entitled to, Plaintiff was not notified that Sun was proposing to classify the JPMC deal as an assigned renewal until a March 17, 2006, telephone call with Schlager. (Plaintiff Test. at 115-121, 159-163, 199; Trial Testimony of Paul Heidcamp at 378-83; Trial Exs 7, 17, 26, 28, 137, 179). A reasonable jury, faced with this evidence, could have found that legacy STK/Sun executives were aware of Plaintiff's request for incentive compensation on the JPMC deal under the 2005 STK Plan formula prior to and during the time STK SSEs were being "transitioned" from STK to Sun, and that, therefore, Plaintiff's damages were within the reasonable contemplation of the parties.

The evidence cited by Sun of the jury's unreasonable interpretation of the evidence consists of Plaintiff's testimony that: (1) he had never received a commission higher than $100,000; (2) Auble had the discretion to reduce commission amounts from what was contained in the commission formula and to adjust quotas; (3) Auble could not have

11

known at the start of the fiscal year that STK would be merged with Sun; (4) the JPMC deal was a renewal; and (5) the JPMC deal was a "low margin deal."

The incentive compensation Plaintiff requested for invoicing the JPMC deal was based on the formula provided by the 2005 STK Plan. Thus, while it was staggeringly high compared to his prior commissions, it is worth noting that Plaintiff had never had a business opportunity like that presented by the JPMC deal, and dedicated an inordinate amount of his time on it. (*See* Trial Ex. 75). Plaintiff testified the JPMC deal consisted of a five-year contract worth approximately $140,000,000, or $28,000,000 a year. (Plaintiff Test. at 182). Had Auble or any other Sun or STK executive informed Plaintiff that his incentive compensation could never exceed a certain threshold for ESS contracts, the outcome of this case would probably be different. But no one ever told him that. In fact, Sun/STK executives kept him in limbo for months, and gave him a draw "to buy time" because the posture of Plaintiff's compensation – whether it was under the 2005 STK Plan or the 2006 Sun Plan – was "unique." (Heidcamp Test. at 333; Trial Ex. 66). Thus, the fact that this anticipated commission was much higher than in prior years is easily explained. Indeed, Auble calculated Plaintiff's commission from the formula contained in the 2005 STK Plan to be $1,864,848. (Auble Test. at 354).

Next, Sun argues that Auble's discretionary authority was unfettered, and that he had the authority to reduce Plaintiff's commission and to adjust quotas, at any time. Sun is partly correct. The 2005 STK Plan did grant Auble the authority to reduce commissions and to adjust quotas; however, before he could exercise that authority, he

12

had to give SSEs, like Plaintiff, notice. (Auble Test. at 350-51, 494) (testifying that before he could institute changes in the 2005 STK Plan, he had to give the salespeople notice of the change). There is no evidence that Auble gave Plaintiff notice of a significant change in his compensation structure specifically with respect to any commission to which he would be entitled under the JPMC deal.

Sun also contends that Auble could not have known that at the start of the 2005 fiscal year, STK would merge with Sun. As a practical matter, that could be said of almost any merger and with any salesperson who works on commission, as commission-based sales are subject to variables outside of the control of the salesperson. Moreover, once the merger occurred on August 31, 2005, Auble issued a revised IPAD the following day that preserved the definition of "ESS," thereby maintaining the definition of what Plaintiff could sell to receive incentive compensation under the 2005 STK Plan. The IPAD also contained a section dedicated to the "Sun Merger" that said nothing about whether an SSE like Plaintiff could receive ESS credit on a maintenance contract on Sun equipment under the 2005 STK Plan. (Trial Ex. 2 at 7). In simple terms, the revised IPAD failed to address whether a STK SSE could receive ESS credit for obtaining a maintenance contract on Sun equipment.

In addition, Sun contends that the JPMC deal was a "renewal," and not "new business" (i.e., an ESS contract) under the 2005 STK Plan. Plaintiff presented evidence that the JPMC deal met the definition of "new business" under the 2005 STK Plan. For example, Plaintiff presented evidence that it was a service contract almost entirely on

13

equipment not previously under maintenance with STK. (Trial Ex. 1 at 2; Trial Ex. 2 at 5; Plaintiff Test. at 229-30, 301; Heidcamp Test. at 379). Further, Sun's "data management tool," which was used to "[tell] a story of how the deal was constructed," marked the transaction as "new business." (Caldera Test. at 277-80; Trial Ex. 89 at 13). Lastly, Sun received a maintenance termination notice in early December 2005 from IBM (whose customer was JPMC), even though the Statement of Work between IBM and Sun was allegedly going to extend into 2006. (Plaintiff Test. at 177-78, 275; Trial Ex. 23).

Sun's final argument is that Plaintiff's damages were unforeseen because the profitability of the JPMC deal was low. Sun's evidence on this point consisted of the testimony of Tracy O'Toole, whose account while at Sun included JPMC. (Trial Testimony of Tracy O'Toole at 577-78). She testified that the profitability of the JPMC account was "much below industry standard" and was "one that was referred to as in the single digits." (*Id*. at 578). Sun, however, did not introduce any figures or percentages regarding the JPMC account's actual profit margin with respect to the deal at issue, nor any evidence regarding the JPMC account's profit margins as compared to other Sun accounts. With more specific evidence before them, the jury was entitled to discount her testimony.

Viewing the evidence in the light most favorable to the Plaintiff, including all reasonable inferences based upon that evidence, the court finds that a reasonable jury could have concluded that the damages awarded to Plaintiff were within the reasonable contemplation of the parties at the time the 2005 STK Plan was effective, and certainly at

14

the time the IPAD was amended in September 2005.

### 5. The Verdict

Lastly, Sun contends that the jury award was not rationally related to the evidence. Case law holds that only those damage awards that are "monstrously excessive," born of passion and prejudice, or not rationally related to the evidence, may be altered by a court. *American Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Auth.*, 125 F.3d 420, 437 (7th Cir. 1997); *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir. 1990). Because the jury's assessment of damages is an exercise in fact-finding, the court gives deference to the jury's damages award. *American Nat'l Bank*, 125 F.3d at 437; *Pincus v. Pabst Brewing Co.*, 893 F.2d at 1554.

Plaintiff testified that based on an annual contract value of $19,830,451, the JPMC deal would, without factoring in the multi-year incentive, produce a commission of $1,449,994. (Plaintiff Test. at 216). Plaintiff also testified that, with the multi-year "kicker," his commission would have been as high as $2,486,086.21. (*Id.*). The jury rendered a verdict on damages of $1,500,000. The court finds, based upon this evidence, that the jury's damages award was rationally related to the evidence.

### B. Wage Claim Statute

Plaintiff also contends that his incentive compensation falls under the definition of "wages" for purposes of the Indiana Wage Claim Statute. That statute provides, in pertinent part, "[w]henever any employer separates any employee from the pay-roll, the unpaid wages or compensation of such employee shall become due and payable at [the]

regular pay day for [the] pay period in which separation occurred." *See* Ind.Code § 22-2-9-2(a). "Wages" are defined as "all amounts at which the labor or service rendered is recompensed, whether the amount is fixed or ascertained on a time, task, piece, or *commission basis*, or in any other method of calculating such amount." IND.CODE § 22-2-9-1(b) (emphasis added).

Courts consider the "substance of the compensation" in determining whether it is a wage, not the name given to the method of compensation. *Thomas v. H&R Block E. Enter., Inc.*, 630 F.3d 659, 664 (7th Cir. 2011) (citing *Kopka, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1072 (Ind. Ct. App. 2007)). A payment is more likely to be a "wage" if it: (1) is not linked to a contingency on factors outside the employee's control; (2) directly relates to the time an employee works; (3) is paid on a regular, periodic basis for regular work done by the employee, and (4) is not paid in addition to other wages. *Id.* at 664-65 (citations omitted). Indiana case law holds that compensation is a wage "'if it is compensation for time worked and is not linked to a contingency such as the financial success of the company.'" *Naugle v. Beech Grove City Sch.*, 864 N.E.2d 1058, 1067 (Ind. 2007) (quoting *Highhouse v. Midwest Orthopedic Inst.*, 807 N.E.2d 737, 740 (Ind. 2004)).

Plaintiff's incentive compensation was part of his overall compensation package. (Trial Ex. 1 at 1). However, his incentive compensation was linked to contingencies outside of his control, such as the profit margin of a contract; it was paid in addition to his $75,000 base salary; it was not paid on a regular, periodic basis for regular work

performed by him; and was not directly linked to the time he spent on any given account. (*Id*.; Plaintiff Test. at 236, 317; Auble Test. at 355, 439, 448-49).  The court's reliance on *J Squared, Inc. v. Herndon*, 822 N.E.2d 633 (Ind. Ct. App. 2005) in its summary judgment ruling was in error.  Unlike Plaintiff, the salesman in *J Squared* did not receive a base salary.  His only compensation was through the commissions he earned through sales, and he received a regular, bi-weekly draw from the company.  *See also Prime Mortgage USA, Inc. v. Nichols*, 885 N.E.2d 628, 664-65 (Ind. Ct. App. 2008) (holding that although the compensation owed to an employee was tied to the employer's financial success, where an employee's compensation was composed solely of commissions, could be immediately calculated, and was paid on a regular basis, employee's commission was a "wage").  Accordingly, the court finds Plaintiff's incentive compensation was not a "wage" within the meaning of the Wage Claim Statute.

## IV. Conclusion

For the reasons set forth above, the court **GRANTS** in part and **DENIES** in part Defendant's Renewed Rule 50 Motion (Docket # 307).  Specifically, the court **GRANTS** Defendant's Motion with respect to Plaintiff's claim for unpaid wages under Indiana's Wage Claim Statute, and **DENIES** Defendants' Motion with respect to Plaintiff's claim

for breach of contract.

**SO ORDERED** this 14th day of December 2012.

                                                RICHARD L. YOUNG, CHIEF JUDGE
                                                United States District Court
                                                Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.